Thanks for calling the case of Wolff v. Aetna Life Insurance Company. Good morning, may it please the panel. I am Mark Schwemler, appearing for Aetna Life Insurance Company. I have asked to reserve two minutes for rebuttal. Your Honor, in this case Aetna seeks permission to appeal a November 22, 2022 ruling by the District Court. Which leads inevitably to the question why you didn't seek 823F of the earlier order. I must say I'm flabbergasted. A couple of reasons, Your Honor. Probably for the same reason we sought reconsideration from the District Court. And that is, frankly, the decision of this Court. And reconsideration is something that you're entitled to do. And you're entitled to do, though, within the 14 days. But you didn't even make the 14 days here, right? No, we didn't, Your Honor. That's another real curiosity. In hindsight, perhaps we should have. But when this Court issued its decision in Allen v. Ollie's Bargain Outlet, it frankly opened our eyes. Another big question, because it has not opened my eyes. And I'm really curious to hear from you and one of the members of the is presiding here. I've read and reread the Allen opinion. And for the life of me, I'm trying to understand how it changed the game in the class action world. You've referred to the requirement of rigorous analysis. Yes. Which we've had since 1982 in the Falcone decision from the Supreme Court. And a further elaboration of what rigorous analysis means, at least within the Third Circuit, as a result of hydrogen peroxide, which has been with us since 2008. Pray tell what was new in Allen that changed the game? I don't think Allen represents new law, Your Honor. But what Allen did was provide tremendous focus upon what a much greater specificity than did Allen. Well, I will say this about Allen. The Allen decision involved a class certification on a nationwide basis, which this Court found to be improperly granted because the Court relied upon scant evidence in certifying a national class about hundreds of stores, utilizing evidence from only two stores in Pennsylvania and some other information, which basically invited the District Court to get to engage in speculation about the requirements of Rule 23. That analysis in Allen, it resonated with us because we found this District Court... Before you get to that, I mean, if your assertion is they got it wrong to start with, that District Court judge got it wrong to start with, don't you have to get past the idea that the modification that occurred was a very minor thing and really didn't change things in such a meaningful sense that the clock should restart? Or is your assertion that if the Court had just changed a comma, that would restart the clock? No, Judge. That is not our conclusion. So your argument has to be, wait, the order that modified the class, modified it in a way that was so significant that the clock should restart, right? Yes, Judge. Our contention is that the second order did change the status quo and enlarged the scope of the class. How so? It changed the scope of the class, Your Honor, and basically the Court in November decided to interpret the provisions of a plan, which it determined in May it did not have a record to do. But it doesn't change who comprised of the class or even its size, correct? No, I must disagree with you, Judge Schwartz. The decision in November found that specific provisions in a different plan that the Court previously decided might allow Aetna to engage in the activity, the recoupment activity at issue. The second order in November decided, without any further record evidence, without any further briefing, I'm going to do a 180 degree turn, and I'm going to include these types of plans in the class. I thought you asked for this change. Am I mistaken about that? Well, that's a mistaken argument being made by my friend here, but... Well, it's an affirmment made that you went along with it, that you agreed to it. And proposed the language. Yes. Yes, but you have to place that into context, Judge. Okay, good. Put it in context where you come up with the language and then could say, wait a second, this really enlarged the class. We really did something to ourselves. What we were trying to do in structuring a class notice before November... Excuse me, I would like to interrupt you there if I may, because that was another very, very important step here. Not only do you not take a 23-F in time after the first order, not only do you not file a motion for reconsideration within the 14 days that is required, instead you file objections to the class action notice that was put together. And didn't you raise some of the same issues in the objections to the class action notice that you eventually raised with respect to the ultimate class certification order? For example, the issue of this allegedly being a fail-safe class. We did raise some objections, yes, Your Honor, but that was... The same objections. Well, it was an attempt to include in the class definition or to exclude from the class definition the exact type of plan that the court ruled in November is to be included. With this kind of chronology and this kind of record, really, is this the type of case that an appellate court under 23-F, which is an interlocutory appeal, ought to give sanction to? I mean, we are in a realm of complete discretion as 23-F and cases have said. How do we possibly sanction this kind of a record through an exercise of discretion? Wouldn't it be a lot more advisable to simply deny your 23-F and have this case go back to the institutional spot, which is always best for handling class actions, the district court, and if there's a need to tweak the class definition or order, it can still be done, right? Well, Your Honor, I... It can still be done, can't it? Well... There is under the rule an opportunity to amend or clarify a class action order up to the point of final judgment. Well, Your Honor, that's possible in some circumstances. Here, I think that court intervention is necessary to avoid big problems down the road because what the district court has done is decided that a class action can be maintained in circumstances where the plan language differs from plan participant to plan participant. So there is no... That was the case when the very first class certification occurred, right? That's true, Your Honor, but the court left the door open. That's the big problem, and it was the big problem to start with. There wasn't a material change that addressed that. That was the problem before, in your view, and that's still a problem. So I'm still struggling with the... What was so material about this change where... It certainly feels like what really bugs you is what you just said, and that's what was bugging you or should have been bugging you at the start. So why should you... Maybe the best way to put it is this way. Would we not be creating a perverse incentive if we allowed a 23 o'clock to restart when a party agrees to and urges a court to make a change in the class certification and then says, hey, it's all new again? It's not exactly a have mercy on me because I'm an orphan after I shot my parents, but you created this. It's not quite that, but you appear to have created the circumstance to allow you to claim a right to read to a new clock. Why shouldn't that all by itself be a problem for us? I don't think it's a problem, Judge Jordan, when there's been a change in the actual material change in the class definition and... I'm trying to get you to answer a very precise question. If you're a party to that change, doesn't that create a problematic incentive that we should be wary of? Well, Your Honor, I disagree with the premise that we were a party to that change. No one asked the district court to make the ruling it made in November. It happened. I realize we have a very limited record here. As you've pointed out, there was no actual hearing held. Am I correct? No, hearing... Did you ever request one? Did you ever request a hearing? I don't believe we did. All of this was done on the papers on submissions. That's right, in reconsideration, but we could not predict the ruling the court made in November. No one asked the judge to go back and start reviewing more planned documents and interpreting them. Of course you did, when you said that the judge wasn't careful in its consideration. Well, we asked the judge to decertify the class. Right, and that's the same thing you wanted... You didn't want certification to begin with, apropos what Judge Jordan's asking. Nothing really has changed. You just are taking this opportunity, you on behalf of your client, to do a challenge that should have been brought to the original class certification grant. Well, I would disagree to the extent that there was no... that you're saying there's no change. That November decision, read in context with the new order, changed a lot of things. The court went back and interpreted a plan that said it did not have a record to interpret, putting aside whether or not it was proper under Rule 23 for the judge to put that issue on the shelf. The judge also did something he did not do in May, which is parse through all of the plan language and purportedly conduct a contract interpretation analysis of all of those provisions. He didn't do that in May. Can you help us with the historical ethnics involvement here, like the back and forth? There wasn't a hearing. These things were done on the paper. I hear you saying, you know, they're the ones on the other side who brought up the concern about the character of the class, that it might be one of those class definitions that is subject to attack because it's bulletproof. And so, in light of that, you knew there was going to be a change, and you participated in crafting the language, did you not, for what the court was ultimately adopted? Yes, long before the court's November ruling. Okay. Now, so, and the idea that this bulletproof... I'm sorry to interrupt, Judge. You said long before the November ruling? Yes. I just want to fix the time. This was going on in July and December of 22, it was after the ruling. I'm sorry. No, I don't believe... I just wanted to make sure we were focused on the right time. I don't believe so, Your Honor. I think there were negotiations amongst counsel prior to November on how to define the class differently, to sort of exclude from the class the very same plan language that the judge in November ruled within. I think Judge Jordan is asking about the fail-safe problem in the language that was approved. Yes. I'm sorry to interrupt. I just thought we were not speaking to each other about the same event. That is true. Before even the November ruling, there were discussions about trying to eliminate the fail-safe nature of the class definition. That's the thing that... I don't know that the district court's aware of what counsel are saying to each other, but at some point, both parties end up in front of the judge on papers and acknowledging, I guess, that there's this fail-safe problem, right? Yes. And both parties have suggested language. There's some agreed on language for the court to deal with, right? Yes, sir. Okay. And does the court take that agreed on language? In its November ruling, it did. Okay. At the same time, eliminating the problem we were trying to cure. Eliminating the problem you were trying to cure? Curing the problem you were trying to cure? Let me be more clear. We were trying to insert an exclusion into the class definition, but the court's ruling in basically said, no, that language is now going to be included in the class. The very purpose for negotiating the change to the class definition was to have the type of plan excluded from the class that the judge in November ruled is in the class. So the ruling on the new class definition came down with the decision in November. They shouldn't be read separately from everything else that was going on before. Because the problem we were trying to cure was this issue about other income benefits provisions that include personal injury recoveries. Yeah, which was an issue from the jump. Yes. Yes, sir. Okay. Anything else? Yeah, I do. I do have a question about a representation made in the February 21st, 2023 letter to the court. Yes. You say the May 22nd, 2022 order changed the class size from 48 to quote a substantial number of additional class members between 342 and 758. That's in the reply. It's the second page of the reply, the letter we requested. My problem with that representation, and I asked you to explain it, is in the district court's original opinion on class cert, it rejected the plaintiff's advocacy for 342 class saying it was speculative, much like a comment you made in response to one of my colleagues' questions. So how could you make the representation that the May 22 order changed the class some way in a way that the district court had rejected as being speculative? What did you mean by that? That can't be accurate. Sure. Well, before the district court was a limited number of plans, not all of them. Well, we only have the record in front of us. You mean class members? Class members, I'm sorry. But the plans that were subject to discovery and produced in discovery do not include all of them that are now covered by the class definition. So I think that is what the letter to the court meant. If you accept this new definition, the class expands tremendously. Excuse me. Go ahead. All I wanted to say is the district court had already rejected that exact number, that 342 saying there was no basis for it. And so you're trying to tell us that the district court outright rejected these hundreds for the purpose of class certification. It dealt with a limited number. But once you get into actually identifying the various plans that are now subject to this new definition issued in November, there are going to be additional plans added into the class. And that's why the number of the same number was the same number under the prior definition. It's the same number now than under your theory. So there has been no change. Well, I disagree, Your Honor. That new definition now encompasses many different plans throughout the country, dozens more that weren't included in the prior definition. Why should the number of class members matter? In terms of... This is a, this is a B3 action. Yes. The reality of class litigation is almost always with a B3 action. Not always, but most of the time. No one's going to know how many class members there are. In fact, that's a big reason for our ascertainability requirement and jurisprudence. Until you're at the end of the game, you don't know who all is making a claim as a member of a B3 class. In fact, B3 is the only form of 23 relief that provides for an opt-out. So at the beginning of the litigation or at the time the class is defined, and that's where the work is done with the class definition, who comes within the definition, you don't even know how many opt-outs you might have. So please explain to me why this number isn't all meaningful. Well, I think we indicated in our submissions to the court that we think that this is an entirely new class, in a sense, an expanded class. It's got to be a change in the class definition, doesn't it? Well, I think there was a change in the class definition. But I think we were just trying to point out that this new class encompasses more people and is different in that way. Good. Okay. Thank you, Mr. Schwimmer. We'll have you back on rebuttal and we'll hear from counsel for Wolfe. Good morning, judges of the panel. My name is Charles Kennebecke. I represent the Appellee Judge Joanne Wolfe. Counsel has admitted that the Allen case, which had been presented to reconsideration, really didn't change the law at all, and the court knows that. And we believe that the reconsideration that was filed well, well late was kind of a way to get another bite at the apple. Was there ever any kind of a hearing held before the judge, or was everything done on the papers, both with respect to the original class definition and order, as well as the November class definition and order? By arrangement of counsel and the court, everything was done on paper, but nobody had requested any hearing. Nobody ever requested, neither side ever requested? That's correct, Your Honor. So, earnestly, what we have here, Your Honor, is that Aetna is trying to appeal the May 25, 2002, 22 order, which granted class certification originally. And they're trying to do it by saying that they're actually appealing the November 22 order, which they say includes a change in class definition. Now, the Third Circuit has not talked about changes that are material. I believe that our Gutierrez opinion used some different terminology, but the Seventh Circuit has used a materiality requirement. If we were to write an opinion, would you suggest that we adopt a material change requirement for purposes of whether it's a new day in terms of class definition? Absolutely, because it has to be a material change. Gutierrez talked about change in the status quo, but materiality would seem to have more legal import to it. It certainly does. Let's dive into the language. Let's look at the difference between the original language for class certification and the modified. First, before we get into the language itself, do you agree or disagree with your colleague that this came up because of something that you, the plaintiff, Ms. Wolfe, asked for that was not generated by them? It was a concern about the fail-safe aspect, potential fail-safe problem that prompted you to raise a problem. I actually think this is who said, hey, wait a second, we're going back to the court. The judge asked us for the issue that we have is on the fail-safe term. That was as a result of the defendant's wrongful reimbursement demands and actions. That's not what I'm asking. I'm asking a historical fact. Where did this, oh, look, maybe we got a fail-safe problem here, come from? Who generated this idea of let's go back to the court and change this thing? Did the court come up with it? Did you come up with it? Did the other side come up with it? Who came up with it? I can tell you unequivocally the objection to the fail-safe language came from the defendant. Was it in the reconsideration motion? It is an you know what, there is. We looked at fail-safe and so we agreed. And Aetna actually then gave the language, the agreeable language, which is what we followed. You agreed to it and the court adopted it. Exactly. Okay. So in your telling of this, and we'll ask Mr. Schwendler about this again just to try to make sure we're all on the same page, Aetna identifies a problem in the way the class is defined, a fail-safe problem. You and Aetna confer. Aetna proposes the language. You agree to it. The court adopts it. Is that the root? That is the root. All right. Now let's look at the language. Okay. As I understand it, there's, you know, through the miracle of word, you can run red lines on these things and actually see what's changed. But it looks like the money language, the thing that really changes is originally it says something like this. The class covers people who sought or recovered reimbursements of long-term disability benefits, paid to insure from the insured's tort recoveries ellipse as a result of defendant's wrongful reimbursement demands and actions based on a violation of the policy. That was the original language. And it turns into we're insured under a long-term disability policy that did not identify personal injury recoveries as other income benefits. Now, what's different there? What's different is that the fail-safe language was removed. Is there anything else different about it? Substantively, no. Materially, no. For example, one difference, a refinement, if you will, is there is now a specific class period. That's true. Judge Brand put that in. Neither of us have. Right. And if anything, it narrows. It narrowed the class. When I received it, I would have been aggrieved by having the class narrowed because it was broader before. But I didn't appeal that. So the other thing that changed was Judge Brand put in the time period which narrowed my class. But other than that, it was really the fail-safe language. So in their letter to us of February 21 of this year, Aetna says that the initial class certification is up to 48 people maximum. And now it's going to be somewhere between 343 and 758 members. Do you know how they got those numbers? Are those numbers correct? Well, actually, Judge, one of the points of my presentation was addressing that. And in short, the first time we've heard the defendant allege that, those numbers, was in the February 21, 2023 letter to this court. Well, if you go back to the district court's opinion, the district court cites there's a record, at least it's attributed to plaintiffs. This 342 number is attributed to the plaintiffs. The citation is to something sealed on the docket in support of the class certification that seems to have come from the plaintiffs. Are we mistaken about that? When we were looking at the class certification originally, one of the arguments that you have to do is you don't always know how many people are in the class. You have your definition, but you don't know how many fall in. So what we did is, at the time, we did an extrapolation that said, Aetna has this many people insured. There are this many subrogation claims. When we look at how many people are insured under the policy, we just said the same relationship. And that's how it came about. But you said to Judge Jordan that the first time you saw the 342 number was in the letter to this court. From the defendant. Right. That was the first time they seemed to embrace that number, as you're saying. Yes. Yes. Because they had always opposed it before. So from your point of view, then, in terms of addressing Judge Smith's comments about changes in material, changes, et cetera, from your point of view, the plaintiffs took the view 342 was the number. Now defendants are embracing that number. Even if the district court rejected it, there's no change. Is that your point? There's not a change in the definition. The number ultimately be the number. Correct. And as Judge Smith said, that's not relevant. That's right. I'm trying to get you to answer Judge Schwartz's question here. Is it or is it not the case that, at least from the plaintiff's perspective, this was always the ballpark you were in? We were doing it based on extrapolation at the point. We were in discovery. We had gotten certain information. Doing what? Excuse me. Clarify. Are you talking about the number, the ultimate size of the class? Are you talking about the number of policies or what? When we were doing the calculation on numerosity, there were a couple of ways that we did it. For example, one of them was known policies that they gave us. And we said, based on that, a certain percentage will have subrogation claims. We then got the bigger number of people insured and said, based on that, if we use the same thing. This may or may not have any significance here, but isn't Aetna actually in probably a better position to know how many people are implicated here than plaintiff and plaintiff's counsel are? They wrote the insurance policies. Absolutely. They are in the driver's seat. It's not like a car accident where there's a witness on the screen where I can contact them, the defense can contact them. It's not that. Literally everything comes from Aetna and Rawlings. That's exactly right. And this too may not be of any great importance, but you just used a word a few minutes ago, which for the first time I've heard or read in the course of preparing this case, you used the word subrogation. And that's how I've generally thought of these claims. But throughout, I think the word reimburse or reimbursement has been used. Do the policies speak in terms of a right of subrogation on the part of the carrier or not? I just used the term in the colloquial sense right now. Yeah. Well, and that's how I've thought of this case in the colloquial sense, that effectively Aetna seeks to be in the position of a subjourn. Yeah. It's subrogation reimbursement. There's actually a technical distinction between the two. There is. There is. So maybe we should take care on this point. Are they entitled to subrogation by terms of their contracts? They are not entitled to reimbursement, which is what the whole case is about. I just used the term colloquially because that's kind of the common term. And the class definition and every other discussion has used the word reimbursement. Because we're being precise in that sense. In talking about the class, I wasn't using the same precision. When Judge Jordan was asking you to listen to him about the class language and the changes or potential changes between the two, I want to ask if you would agree with this, that both of them speak of the insured, speak of who sustained a personal injury, who received a recovery, from whom reimbursement was sought, and who had policies that didn't allow it. Would you agree that those five things are the definition of the original class definition and the second definition? I agree with that, Your Honor. As a result, are there any changes between the two other than the time frame that Judge Smith mentioned? No. And that's what I said in responding to Judge Smith. There's no material change. Some things, like they would say in that insured instead of saying an insured by Aetna. But other than syntax, you're exactly right. And what I would add, Your Honor, very briefly, is it's clear that this is an appeal when we look at what they're trying to do. They're not attacking the November 22 certification. They are trying to decertify the case entirely. So when we look at what occurred, removal of the fail-safe language, or the insertion of the date, that's not what they're attacking. They're not attacking that for the November 22 order. They're actually trying to decertify the entire thing, which is what had already occurred. I don't think they're even shy about that. No. They're pretty up front about it. So the real question is, does Gutierrez allow them to do that? Is what Gutierrez changed material enough to open this all up again? Right? Because you'd have to agree that, assume for the sake of argument, that they hated provision A and provision B of a class certification. And the court, for whatever reason, materially changes provision B. There's nothing sacrosanct at that point about provision A that prevents it. I mean, if the clock restarts because of the material change in provision B, they can argue about provision A too, can't they? Because the clock has restarted. If the 23F clock restarts and we were to certify, the whole thing would be up for grabs on appeal, right? I suggest no, Your Honor. Well, just the new definition. Just that's what I'm going to call alteration. What's your law for the idea that if there's a material change, it doesn't open it all up? Okay. Well, we had the Sixth Circuit case cited by Judge Brand. But more particularly, we were just talking about the alteration. Can you appeal everything or just the alteration? I suggest that this court, Sister Court in the Seventh Circuit, in the Driver case at 739 F.3d 1076, addressed this issue and said, there's no reason why such an alteration should open the door to an interlocutory appeal unrelated to the alteration, which is exactly the issue that we had immediately at hand. That is, you appeal what is new, because if you didn't appeal something before, you didn't. You can now appeal what is new. And the Seventh Circuit in the Driver case said that's exactly right. Okay. Thank you very much. Thank you, Judges of the panel. Thank you, Mr. Schwimmer. We'll have you back. Thank you. Just to be clear about what happened in November. We were negotiating a change to the class definition to hopefully omit from the class certain types of plans. The November ruling came down, and the decision was that I'm going to interpret a plan I did not have record evidence enough in May to interpret, and I'm going to include that plan now in the class. At the same time, the Court issued and adopted the new class definition that Aetna all along thought would exclude these plans from the class. But if you compare the two definitions, I'm going to ask you the same question I asked your adversary. If you look at them, they talk about insureds who sustained a personal injury, who got a recovery, from whom reimbursement was sought, and who had a policy that didn't allow it. Both definitions tell me who the class is. None of that changed between the two. And if I'm mistaken, identify where in the language of the second definition tells me that the language is different. The second definition excludes from the class plans with other income benefits that include personal injury recoveries. The problem is we don't know what that means. Well, the benefit provisions are your language and your policy. Your Honor, we thought it meant the plan that the Court excluded from its analysis in May. But the Court, at the same time in adopting the new definition, eliminated the benefits we were trying to get through the new definition. Where did the language come from? The way the Court poses it is, I am accepting the modified language proposed by Aetna and agreed to by Wolf. That's how the Court describes it. It was mutually agreed upon, and the Court gutted... It did adopt the language you proposed that was agreed to by Wolf. Is that correct? Yes, Your Honor. And at the same time, gutting... The one we're witnessing sounds unapologetic to me, like invited error. Well, Your Honor, I don't think you can view the order without looking at the opinion that was issued with the order. Because the benefits that were trying to be negotiated with the new class definition were taken away at the same time by the judge when he did a 180-degree turn and decided to interpret the policy against Aetna. I see I'm out of time, but can I raise one additional point about subrogation with the panel? Yes, sure. That came up. Yeah. The policies, we pointed out all kinds of differences between the various plans at issue here. Certain of the plans that we put before the Court have specific provisions in them, subrogate against personal injury recoveries to retain and be reimbursed for the disability benefits paid. That's a significant difference in the plans the Court didn't even address in either ruling. All right. Thanks. We'll ask the parties to make arrangements to have a transcript made, and we'll... Since this is Aetna's petition, we'll ask Aetna to bear the cost. Certainly. All right. We'll stand and recess. We've got it under advisement. Thank you.